**GODFREY L. CABOT, Inc., v. J. M. HUBER CORPORATION.**

No. 4.

District Court, N. D. Texas, Amarillo Division.

Aug. 9, 1940.

374

Fish, Richardson & Neave, of Boston, Mass., Underwood, Johnson, Dooley & Wilson, of Amarillo, Tex., and William Jarrel Smith, of Pampa, Tex., for plaintiff.

Vinson, Elkins, Weems & Francis and J. V. Martin all of Houston, Tex., and John W. Beveridge and Walter David, both of Borger, Tex., for defendant.

JAMES C. WILSON, District Judge.

This is a patent infringement suit with many novel phases, including an unusual historical background. Really the only two patents involved are those of plaintiff, as an assignee of Billings and Offutt, the patentees. They are No. 1,957,314, and the reissue thereof, No. 19,750. These patents cover a carbon black product. Also plaintiff's No. 2,120,541. This covers a method or process for making said carbon black product. The plaintiff and the defendant, with their affiliates, are large corporations, and have been for many years in the business of manufacturing carbon black, mainly in the gas fields of the Panhandle of Texas. Between them, they manufacture and process a large percentage of the entire output in the United States, extensively used by all factories manufacturing automobile casings. It constitutes a binder for rubber that accounts for the toughness of modern automobile tires. In conjunction with their manufacture of the raw carbon black, each of them have very large plants where they process such black, through the methods here involved, mainly to facilitate its handling and shipping. Their respective products,

as well as their respective processes, are in contest here.

Plaintiff in its petition first states that its Patent No. 1,957,314 was issued on May 1, 1934, and that subsequently it surrendered this patent, and procured the Reissue No. 19,750 on the 12th day of November, 1935; then alleges: "Between May 1, 1934, and November 12, 1935, defendant, within said district, infringed said Letters Patent No. 1,957,314, and since November 12, 1935, defendant has been and still is, within said district, infringing said Letters Patent Reissue No. 19,750, by making, selling and using carbon black embodying the invention patented in said Letters Patent, and will continue to do so unless enjoined by this Court."

Next, it states that Patent No. 2,120,541 was issued on June 14, 1938, likewise to Billings and Offutt, and assigned to them, for an invention in the manufacture of carbon black. As to this, it alleges: "Since June 14, 1938, and prior to the filing of this complaint, defendant has been and still is, within said district, infringing said Letters Patent No. 2,120,541, by practicing the method of manufacture of carbon black patented in said Letters Patent, and will continue to do so unless enjoined by this Court."

There have been some motions for particulars filed by each of the parties, and answers made, but it will not be necessary to refer to any in detail except defendant's first. In furnishing particulars and by stipulations, plaintiff narrowed its suit to alleged infringement of claims 5 and 6 of its Reissue Patent No. 19,750, and claims 19 to 27, inclusive, of Patent No. 2,120,541.

Defendant has process and apparatus patents assigned to it by the inventor, Howard W. Price. His first application, serial number 703,402, was filed December 21, 1933. On a continuation of said application, patent No. 2,164,164 was finally issued on June 27, 1939, entitled "Carbon Black and Method of Treating Same". Defendant's other patent is 2,127,137, issued August 16, 1938, to Howard W. Price, entitled "Apparatus for Treating Finely Divided Powder". It covers an apparatus for processing carbon black. In defendant's said motion for bill of particulars plaintiff, having on two occasions prior thereto made an inspection of defendant's commercial machine and process and product, asked it to answer: "Whether said method (defendant's method) is,

substantially the same as the method disclosed by the application for Letters Patent of Howard W. Price on or about December 21, 1937, said application of Price having been filed in United States Patent Office on or about December 21, 1933, Serial No. 703,402."

Plaintiff merely answered: "In a rotating drum machine generally similar to the apparatus disclosed in the drawings of the Price application, Serial No. 703,402". By implication only this answer may be regarded as a denial. See my opinion filed herein June 21, 1939, disposing of defendant's motion for summary judgment, based on plaintiff's answer.

Following this, the defendant filed its answer. It raises many defenses. First, it denies all allegations of infringement as to both the process and product patents of plaintiff; next, that plaintiff's patents are all invalid for want of invention, in that plaintiff's method and product described and claimed, prior to their issue, had already been patented or described in prior patents and printed publications, for more than two years prior to Billings' applications for same, citing as anticipation and prior art, fourteen patents and certain publications; that the methods and products had been in public use and on sale in the United States for more than two years prior to the filing of the applications for same; specifically as to Reissue Patent No. 19,750, that it was invalid for want of adequate disclosure, under the statutes of the United States; that plaintiff is estopped to maintain this action, because of certain interference proceedings, between these parties, which were pending before the Patent Department for a number of years, involving the respective applications of the patentees herein, and because of a consent decree entered into between the parties, terminating same. Particularly replying to plaintiff's answer to defendant's motion for particulars, as referred to above, that plaintiff is estopped because the defendant actually uses in commercial practice the method and makes the product, disclosed by Price in his original application, as amended, on which plaintiff's Patent No. 2,164,164 was issued.

These parties are old acquaintances in litigating some of the principal issues involved here. The patentees, Billings et al., being associated with the Cabot Company, and Price, being associated with the Huber Company, were working on their respective inventions at the same time, and, so far as I know, wholly independent of each other. The question is raised, but the evidence does not satisfy me, that Price knew of the Billings method and product prior to filing his application. The first Billings application was filed on November 16, 1932, for the manufacture of carbon black. This finally resulted in the issuance of his process patent, June 14, 1938. Its construction and validity is directly involved. Price's first application was filed December 21, 1933. On October 19, 1934, the Patent Office suggested that Price make certain claims, with the purpose that formal interference proceedings would be declared between these respective applicants. On December 3, 1934, the interference was declared, after Price had on November 15, 1934, amended his application by adding claims to meet the suggestion of the Patent Office. It is clear that neither Billings nor Price knew who would be the opposing contestant in the interference proceedings.

The two questions involved in the interference were: (a) whether claims of Billings as originally made, and Price's as amended, were sufficiently broad to disclose an invention, patentable to any one, and (b) if they were, should the patent be issued to Billings or Price. This interference was pending for several years. During the time, the defendant instituted public use proceedings, I think December 10, 1935. The issue presented there was in substance that such methods for the treatment of carbon black had been in use for a period of more than two years prior to the filing of the Billings' application. This was vigorously prosecuted, and the record of that proceeding constitutes a rather formidable volume, as does the interference proceedings. In the public use proceeding, the defendant won before the Patent Examiner, but was reversed by the Board of Appeals, the effect of its decision being that Billings' claims were patentable. Pending these proceedings no patents were issued to either Billings or Price. On January 5, 1938, the interference proceedings were ended by an order of the Commissioner of Patents, this being by the agreement of the parties themselves; in other words, by a consent decree.

Broadly speaking, the cardinal features of the two schemes were, a machine and such operation, as would effect (a) for Billings a "turbulent agitation" to convert

carbon black from its soot like form into a dustless pellet like form, and (b) for Price a machine and such operation as would effect a "gentle agitation" for a like purpose. The effect of this consent decree was that no interference existed as a matter of fact between them, and further, that the term "turbulent agitation" as called for in the Billings' application would not read on the Price application, since Billings called for more violent agitation than Price described. Billings and plaintiff, with reference to a petition to dissolve, filed by Huber, agreed: "We agree with our opponent that the Price application cannot support the claim, and if this is the proper time to do it, join with him in his petition that the interference be dissolved, either by reason of his disclaimer and abandonment by admission and otherwise or because *there is no interference in fact.*" (Italics mine)

The Commissioner's order, as a result, in the last paragraph says: "It clearly appears by the statement made by the contesting parties that neither of them considers that the claims in issue, if interpreted as the Board has interpreted them read upon disclosure of Price. Such being the position of the parties, no reason appears for continuing the interference. By analogy, therefore \* \* \* the interference is dissolved."

To complete this history, the plaintiff, though it had at that time made no inspection of the Huber plant and its commercial practice, and product, since 1934, filed this suit on October 19, 1938.

■ Now the real issue presented is, whether Billings' claims in issue can be read on the method actually used commercially by the defendant and the product it actually produces. Plaintiff says it can. The defendant says it cannot. That is what the trial is about. Defendant vigorously urges its defense of estoppel, based on the binding effect of that consent decree. However, it only bears collaterally, if at all, on this main issue, which stated in a little different way is, does the commercial method (I use method and process as synonymous), actually practiced by defendant, and its product thereby manufactured, here alleged to be infringements, truly come under the Price applications and claims. The burden is on the plaintiff to establish that they do not. If it fails, defendant is entitled to a decree.

Boiled down, though defendant doubtless enjoys a sense of security and a comfortable feeling in the possession and ownership of its patents, its situation, as to defenses, would not be essentially different were it not the owner of any patent. For the reason, the real issue stated in still a different way is, does the defendant actually use the plaintiff's "turbulent agitation" and "priming charge" process and make the product called for in the Billings' patents. Plaintiff must establish that it does, or fail. The consent decree, and none of its history, bears on that. It is the initial issue and solely a fact issue. There is no law involved, I mean no controversies as to the law touching that issue. If that issue is decided against the plaintiff, the case ends there with no occasion or necessity of discussing any of defendant's other defenses. Were that issue decided against defendant, without patents, as well as with them, its other defenses, such as the invalidity of plaintiff's patents, should be gone into, but not the defenses of estoppel. They would be foreclosed. Theoretically defendant can avail of them only if it is shown to use its own process, when, as a practical matter, if that is shown, they are useless.

The trial of this case commenced June 17 and ended June 28. The oral testimony and depositions cover more than a thousand pages. The exhibits introduced, most of them not read to me, would run the record to several thousand pages. The printed arguments and briefs run to several hundred pages. The amount of money involved, if defendant were ordered to account, no one could hardly estimate. The testimony given orally in court was solely by two expert witnesses, Edmund Billings for plaintiff, and Ira Williams for defendant. I constantly had a feeling of wanting to "take off my hat" to these two expert witnesses. I will plagiarize a little to say they were "a breath of spring", compared to the average of experts who come into my court. Each of them had lived this carbon black manufacturing and processing, from an educational, a scientific and practical standpoint, for years. They are college men of high degrees in science, but more important, with the broadest practical experience in the very matters involved. Their profound grasp of the scientific subjects inquired into, their readiness and ability to answer every question promptly and with such unusual clari-

ty, accompanied by a conscientious desire to give just the facts, as they understood them, and just those opinions, which, from their respective viewpoints, they felt could be abundantly justified, greatly lightened the burden of the Court. Their attitude and the high plane upon which the case was conducted throughout by the attorneys, left me with a feeling of regret that it was my lot to decide the case.

However, after spending two weeks exclusively on this case, subsequent to the trial, I have reached the conclusion that defendant's motion for summary judgment should be sustained.

The most I am able to say in behalf of plaintiff's case is, in the words of its reply to defendant's motion for bill of particulars, referred to above—that the processes and products of the parties are "generally similar". Yet they are so dissimilar, in vital particulars, I heartily agree with the Patent Department, in granting to both Billings and Price their patents. It follows, if they live within them, one can not infringe the other. I am convinced that is what they are doing.

This carbon black is formed by burning natural gas on metal surfaces; in other words, by incomplete combustion. In its original form, on the metal surfaces, to the average person it would appear to be just ordinary lamp or chimney black. The first step is to scrape it off, and then it goes through conveyors into agitator bins, or may, though it is not the practice of plaintiff, go direct into the processing machines. In that original state, it is better described as flocculent black. It then weighs only 2 to 3 pounds per cubic foot, due to entrained air to the extent of about 85 per cent. In the agitator bins, it is subjected to a stirring action, which has some tendency itself to granulate the black, and, very definitely to separate it from the entrained air. This is shown by the fact that its density and bulk is reduced, so that it then weighs approximately 15 pounds per cubic foot. When it is scraped from the channel irons it is a very light, dusty, almost smoke like, amorphous, substance. It is described as flocculent because of the inherent disposition of the particles, like sheep however badly scattered, to run into flocks, small or large. These amorphous particles of black do that, with such regularity especially when encouraged a little, that it impresses an observer that it is a result of individual choice or discretion on their part. Another marked characteristic is that they are agglomerative, in that the particles show an ability, again like sheep, to stick together, not absolutely, but with considerable tenacity. Being so light, to sack it, even after it has gone through an agitator and much of the air removed, it would be almost like sacking smoke. In such state necessarily it is highly viscous, and even after agitated to 15 pounds per cubic foot, it is still highly viscous, so much so that it cannot be handled by pouring, for example, as granulated sugar or salt. As a result, it cannot be forced through pipes or shoots, except with enclosed cup like or screw conveyors. Loading or shipping loose in bulk, of course, is out of the question. Its handling for shipment, or for manufacturing purposes by rubber manufacturers, was most disagreeable and harmful from many angles, among them resulting diseases to the employees, particularly respiratory troubles. To remove these very serious obstacles to its commercial handling, presented a beckoning and lucrative opportunity for inventive genius. This was the picture as far back as 1915. Many tackled the problem, through inventions quite different from these, with no notable success, between 1915 and 1932, near which time these respective processes commenced to be used commercially. These two inventors, Billings first, and Price following immediately, were probably the first to tackle the problem of evolving a complete system of processing this black in its dry state, and thereby convert the light, dusty, smoke like substance into a granular state, so that it would pour, and could be handled through pipes, tank cars, etc.

During these intervening years, the only method devised to handle it in its dry state that would facilitate shipping, was the use of high compression machinery, by which it was pressed into blocks or briquettes of varying size, which did greatly facilitate its handling and shipping, but it was almost as unsatisfactory to the consuming factories, since when broken up, its handling there was attended by like disagreeable and harmful results. Naturally, there was a great commercial demand for the invention of some process that would meet the situation. That commercial demand was met by the processes involved here, and in a most complete and satisfactory way as evidenced by the fact that the products of dry processing are now universally

accepted by the rubber industry. Practically all of the dustiness has been removed. Its weight per cubic foot, as a result, has been increased to 25 to 30 pounds per cubic foot. It can now be shipped in tank cars, poured through pipes or shoots, and handled through any kind of conveyor in a very similar way to many kinds of agricultural products, such as wheat, millet seed, etc.

These processes start with agitator black, and the above characteristics of flocculent black, as public information. Inventive genius was required to capitalize on those well known natural traits of carbon black and the well known characteristics, of agitator black and similar processes for pelletizing black. The problem was to produce a process, mechanical or otherwise, by which the size of the flocks would be controlled and made into shapes practically spherical, still infinitesimal in size, with polish enough to facilitate handling, with a toughness that would withstand the ordinary strains of commercial handling, but not so much as would prevent easy and controlled disintegration, by mild forces, in the rubber mills. All of this they accomplished.

■■ Now being a layman to the profession of these experts, and with little mechanical sense, it is very difficult for me to give any idea of these machines, and the processes and products, without the use of common-place, more than technical, terms. To quote the descriptions and claims of the patents, in this opinion, of course, would be out of the question. To describe them in my own way in a reasonably brief space is difficult, but best I think, supplemented by quotations from the witnesses and patents. Machines, of course, may be patented, but the plaintiff's patents in this action are not machine patents but process and product patents. Really there are not so many patents as their separate numbers might indicate, since, as in this case, where one patent is issued for a process and another is issued on the product of that process, in law they constitute but one patent  It is impossible, however, to ever understand these processes without understanding the machines which in operation exemplify these processes. Under the law the parties may depart from their machines, and as between the machines, as described in the applications, and those actually in commercial use, each of them has departed to some extent.

They are, however, in essentials, substantially the same as started with.

The plaintiff's machine is a large upright steel drum. Its exact dimensions are not important. The diagrammatic picture of it that accompanies the plaintiff's patent would impress you that it had so much machinery in it that there was hardly room left for any material. However, in plaintiff's machine, as used in commercial practice, in the drum there are two separated sets of screw like spirals, called helices, which revolve around a vertical axis, one inside the other, extending from the bottom to near the top of the drum, and the effect is as if one turned clockwise and the other counter-clockwise. In the space between these revolving spirals are stationary posts, called baffles. It is what is called a batch machine; in other words, a complete working batch of the black is emptied into the drum from above. Run for a certain length of time, this black will all be converted into a granular or spherical form, without anything added to accelerate the process. To speed up the conversion, however, it is essentially a part of plaintiff's process, that what is called a priming charge, usually consisting of a batch of finished product, be dumped in on the black. An electrical lever is then pulled and the processing, by the revolution of the helices, begins. When it is completed, the drum is then emptied from the bottom, and the same steps of filling and priming is repeated, and so on. The theory of plaintiff's process and how it is effected by plaintiff's machine, and the product built up, is described by Mr. Billings himself, in words, and with a brevity, that would be beyond me, as follows:

"This process in this patent is based on our discovery that if you subject carbon black to what we call in here, 'turbulent agitation' you will change its normal amorphous flocculent dusty character and convert it into a mass of small discrete tough granules which are strong enough and have such other physical characteristics as are necessary to make them readily transportable in bulk without disintegration, while being so transported. The basis of the invention is the subjection of carbon black to the turbulent agitation, and turbulent agitation means two things, simultaneously or during the same period of treatment. The meaning of the term is defined in various sections of this patent and set out, and it is something like this, in the

first place, particles of carbon black to be subjected to turbulent agitation must receive frequent and multi-directional impacts over sufficient periods of time until the growth of the particles into granules is accomplished, and the other thing that turbulent agitation means, broadly, is this, that while the impacts and the pressures are being applied to the individual particles and the individual granules, those granules that are being treated have also got to be maintained in a state which we call 'turbulence', and turbulence means a turning and twisting, a random motion, a state of unrest in the mass as a whole. The result of the combination of these two things, of the multi-directional impacts, multi-directional pressures, plus the turbulence, is that the particles are treated symmetrically and thus are caused to grow symmetrically, and thus become or come out in a spherical or somewhat spherical form. It is not necessary that the turning and twisting and restlessness of motion, turbulence and impacts, be exactly at the same instant of time, but it is convenient to have them that way. It is also convenient to deliver impacts, and thereafter turn and twist the particles until another impact."

As to the process, its essentials are the turbulent agitation, the function of the priming charge, and the multi-directional pressures and bombardments that are systematically applied to the material from start to finish. To use a homely illustration, plaintiff's machine is comparable to the modern churn. It is usually an upright crock, or a glass jar. If you can picture one of those with two sets of paddles inside, adjusted at an angle about like airplane propellers, arranged in vertical rows from bottom nearly to top, being turned by a hand crank or electric motor, one cycle revolving clockwise and the other counter-clockwise, with stationary posts set at intervals in the circular space between the ends of the paddles, you are readily able to visualize agitation, turbulent or gentle, depending upon the revolutions per minute, that would be created in the milk, and the multi-directional pressures and bombardment that would be applied. The process is fairly comparable to what goes on in plaintiff's machine. Also, the butter fat in the milk, similar to black, has its tendencies to flock together and agglomerate into globules of butter. The ordinary churn in bringing that about performs a very similar function to these machines in dry processing the carbon black.

Mr. Billings, when working on his invention, apparently was imbued with the idea that, to accomplish the desired purpose and realize on this very great commercial demand, it would be necessary to use relatively complicated machinery, and only such as would effect turbulent agitation, this turbulence and processing to be facilitated by the priming charge. The most of us can recall from our childhood experiences and observations there were two systems of churning with the old-fashioned upright churn and the old dasher. One was to churn frantically, creating much violence, and the other was the steady, continuous gentle stroke. As far as I can recall the latter was superior. In any event, Mr. Price when he came to work out his process, definitely was imbued with the idea that a gentle agitation, with no priming charge, would much more efficiently and economically accomplish his purpose. That is his process. His machine is so simple it is comparable to taking the old-fashioned upright churn, sealed at the open end, a round rod of iron loose on the inside, half filled with carbon black, and rolled horizontally on the ground. In other words, the defendant's commercial machine is a horizontal drum, divided lengthwise into four separate compartments, with an inlet opening for the material in the center of the front end, with a like hole for the outlet of the material at the other end, with like holes in the three partitions. The material is fed in mechanically, and continuously passes from one section to the other, the finished product passing out at the last opening into conveyors. In the first two drums there are iron rollers, free in the bottom. The drum rotates horizontally, not on a spindle or axis, but on suspended wheels, fitted with ordinary automobile casings. Two lines of these wheels are placed each on a common axis, and stationed parallel to each other. The drum is simply placed on these wheels, resting on the rubber tires. If the wheels are rotating clockwise, of course the drum as a consequence, with its load, is rotating counter-clockwise. How gentle or how turbulent is the action upon the material, depends upon the speed of the drum's rotation. In the Price patents, a rate of not more than ten revolutions per minute is first indicated. In later descriptions of the Price patents, it is recommended that a rotation at a lesser speed produces a better product. In actual commercial practice, the testimony

here shows that the defendant's operation of these drums is at a speed from four to six revolutions per minute. Of course, the peripheral speed depends upon the diameter of the drum, and here the defendant's drum being about 10 feet makes a speed of 113 feet per minute. These rollers in the first two drums, as I recall, weigh about 400 pounds each. It can be readily seen that when defendant's drum turns, considering the light, dusty, sticky like nature of even the agitator black that the bulk of it would adhere more or less to the wall, as it moves upward. The drum can be speeded to a point where the material, through centrifugal force, would adhere to the inner-circumference of the drum in the form of a complete circle, and of about uniform thickness throughout. On the other hand, it can be readily visualized that the speed of rotation of the drum could be worked out by which the upper part of this ascending material, when it reached near the top of the drum, would, as a matter of weight and gravity, drop or cascade to the bottom of the drum or slide down the face of that part of the material that would be then ascending; in other words, something similar to a snow slide down a mountain. The defendant's drum is rotated at such speed that that is what takes place at the top of the ascending material, and it's a continuing, never ending process. What takes place here is very similar to the experience most of us have had in our childhood, in swinging a bucket full of water, in a vertical circle; if fast enough, not a drop of water would spill, but if slowed down sufficiently, at or near the top, it would cascade down on our heads. This carbon black being constantly carried up the walls of the four sections of the drum, and constantly cascading down to the bottom, and to what the experts describe as the angle of repose, and the sliding of part down the face of material moving up, is one of the important features of defendant's process. The rollers functioning at or near the bottom serve to press out what air may be still entrained in the material, in addition to their compacting pressure on the various formations. The weight of a load of this material, as I recall, in one drum is approximately 7,000 pounds. It can readily be appreciated, in that part of the material being carried upward, there is a grinding and pressing process, as one particle moves and rolls in contact with another.

One point that plaintiff stresses vigorously, to show turbulent agitation in defendant's machine, is this constant falling action of the material in defendant's drum, down to the bottom, and down the face of other moving material. It is true if there is any place, in defendant's process, where turbulent agitation is effected it is here. It is only fair to say that there is an apparent turbulence of the material when this particular action is observed. In defendant's drum, unlike plaintiff's, this smoke like substance has room to fly, and does. If turbulent, the gentlest fall could not make it otherwise. Being so, it is an action that Price could not very well avoid, or eliminate, if he had tried. How turbulent is that entire action, largely depends upon two factors—the speed of the drum and the character of the material. It can be readily visualized that the turbulent pressure would be much less with a light fluffy dust like material such as this carbon black; that it would become more turbulent depending upon the hardness and the weight of the material. For example, the plaintiff experimented in open court with a number of different kinds of materials in models, supposed to be an approximate replica in action of one section of defendant's drum. For instance, turnip seed and tapioca were used, and even glass cloud marbles of diameter ranging from a quarter to a half inch. On the whole, I was not impressed with those demonstrations as fairly representing the action of the material in defendant's commercial practice. There was, of course, some more turbulence of the turnip seed, and some more possibly of the tapioca, and a very decided and a very great increase of turbulence where the glass marbles were used. The plaintiff, on the other hand, did not use any of these materials for the purpose of demonstrating its own machine or process. I have the impression, if it had done so, it would have very much emphasized the marked differences in the two processes, one turbulent and the other gentle. The turnip seed might have withstood the grinding and bombardment in plaintiff's commercial machine. Even the tapioca might possibly stand it without complete disintegration. There is one thing certain, on the other hand, it would have been impossible to have demonstrated with the glass marbles in Exhibit 38, being a model of plaintiff's machine. I am just as certain, if tried out in plaintiff's commercial

machine it would have destroyed the marbles or the machine, or both, likely the latter. No demonstration is useful, with a material, that can not be tried out in both machines, or that can not be tried out in either machine. If plaintiff had tried out these materials in demonstrating its own process, I think the result could hardly have been adequately described by the word turbulent, but rather, as violent or dynamic. I was impressed on the whole, from the demonstrations, that there was no material used, or really could be used, that would fairly exemplify this process in the models, or in the commercial machines other than the flocculent or agitated black itself, or a like substance.

It must be kept in mind that the individual particles of the crude carbon black are so fine that no microscope has been invented that will tell us anything of their form. Furthermore, that even such product in its completed granular state, in so small that its form cannot be detected by the human eye; that it takes a microscope around 27 power to enable one to observe its ultimate size, shape, polish, etc. When such a microscope is applied, one can readily appreciate the complete success of these invented processes.

The Patent Department, when it issued patents to each Billings and Price, were fully aware of the differentiating characteristics of these processes. The descriptions and the claims, respectively, are so framed, that plaintiff cannot use the gentle agitation process, and the defendant cannot use the turbulent agitation process. However, I do not think the defendant should be held to lose its patent rights even if it could be held that there was a single point of turbulent agitation in its process, nor do I believe the plaintiff should be deprived of its patent rights because there might be some single point of gentle agitation in its process. As a matter of fact, there is a point of very gentle agitation in plaintiff's process, and that is on the top of the material in its upright drum. At that place there is a very gentle eddying action. It is a machine action and not a result solely of gravitation, or centrifugal force, or like principles. By no stretch of the imagination could it be classed as turbulent, but on the other hand, it is gentle, and as gentle as any particular point of action that you can find in the defendant's commercial machine. If, on the whole, one is turbulent and the other is gentle, both comply. It is the substance we are concerned about.

Apply whatever descriptive words you may to this continuous falling by gravity of the material in defendant's commercial drums, it is nevertheless expressly called for in defendant's patents, both in the descriptions and the claims. Plaintiff stresses, nevertheless, that it is turbulent and infringes. Nearly all of us refer to it sometimes as cascading. The defendant, however, rejects this description where it says in its patent: "The drum should not rotate so fast that the carbon black is carried upward and caused to cascade back into the center of the mass." The phrase "tumbling and rolling" is by far a more exact description of this falling than turbulence. Price in his original application, No. 703,402 on page 5, describes this falling of the material as "a continuous tumbling, tossing and rolling action"; on page 6 as "a progressive moderate rolling and tumbling of the particles which effects a continuous gentle tossing action"; and one other place on the same page as "tossing action", and on page 7 says: "As the drums rotate, the carbon black is tossed, rolled and agglomerated"; in original claim 1 it speaks of "subjecting the same (material) to a gentle tumbling and rolling action"; in claims 4 and 5 "subjecting the said particles (material) to a continuous gentle tumbling and rolling action"; and in defendant's method and product Patent No. 2,164,164, this falling of the material in defendant's drum is referred to in the description on page 3 as "regulated tumbling action", and on page 4 is referred to as "the gentle tumbling steps of the process". The 10th claim of that patent reads as follows: "The method of treating light, flocculent carbon black by gravitational forces which comprises advancing said black along a predetermined path at the same time subjecting the particles thereof in the dry state, first, to a compacting pressure under rollers maintained in spaced relation to each other while *simultaneously tumbling the same by continually slowly raising increments of the mass to a point where the top portions thereof shift by gravity by reason of their inability to reach a state of repose, and thereafter continuing said tumbling without said compacting pressure until relatively tenacious self-sustaining granules are formed."* (Italics mine)

Now, it makes no difference what this tumbling of the material on the top down to the bottom of the drum, and down the face of the material is called, be it turbulent agitation or cascading, the Patent officials at Washington were fully apprised by Price, in his application and claims, of exactly what took place, "a tumbling and tossing and rolling action". After most carefully watching all of the demonstrations, and listening to all of the evidence of the witnesses, I find that those words are more truly descriptive of what actually happens. The Patent Department was fully aware that tumbling and tossing and rolling of the materials was what took place, and long before defendant's patents were issued. Defendant can not revolve its drums without this action taking place. To here hold that defendant infringes, because of this tumbling of the material, which perchance might be technically termed turbulent agitation, would, in effect, invalidate defendant's patent, the validity of which is not even questioned in this proceeding.

In addition to this, all of these descriptive words as to the tumbling and tossing action in defendant's application and claims, were before the Patent Department, as well as plaintiff's descriptive words "turbulent agitation or pressure", etc., in the interference proceedings. And the Board of Patent Appeals, in the public use proceedings expressly dealt with such term. The Board, in its opinion construed plaintiff's process to be one of turbulent agitation. It then discusses the Price application, and said: "On examination of the Price application we find a different apparatus, in fact it is urged that this apparatus is more like the ball mill, referred to in the early Billings application. The first filed claims of Price called for a process of treating carbon black comprising amalgamating particles thereof by subjecting the same to a *gentle tumbling and rolling action.* (Italics mine)

The effect of the Board's opinion, in reversing the Examiner, was to hold that the Billings claims were patentable; that the effect of agitator bin and other preliminary processes of treating carbon black did not effect turbulent agitation as claimed by defendant. The Commissioner of Patents, acting in response to the opinion of the Board, and directly in response to the agreement of these parties, said: "It clearly appears from the statements made by the contending parties that neither of them considers that the claims in issue, (Billings' claims) interpreted as the Board has interpreted them *read upon the disclosure of Price."* (Italics mine)

In other words, that "turbulent agitation" as made and described by Billings did not read upon the tumbling, rolling and tossing action, as described by Price. The plaintiff in that connection, agreed in writing, "there is no interference in fact". That was an affirmation on plaintiff's part that its claims of turbulent agitation did not read upon the description and claims disclosed by Price. Nothing could make it plainer to my mind that plaintiff is absolutely without any right to claim infringement on the part of defendant, because of this tumbling and tossing action in the defendant's drum, call it whatever else you may.

The United States Court of Patent Appeals in the case of In re Cirves, 87 F.2d 208, 210, defined agitate, "to move with a violent, irregular action". The Board of Patent Appeals said, "it is apparent that turbulent agitation must be more violent than mere agitation". Looking to the oral testimony, Mr. Williams also defined turbulent agitation, and dealt with the respective processes involved, as follows: "The Cabot machine is a machine which produces a motion of turbulence and produces what is called turbulent pressure. Turbulent agitation is a term that is not ordinarily used, but we can get at the meaning of it, because agitation is a motion' of mass, and turbulent means disordered or unorganized. So that turbulent agitation is a moving of the particles which are completely disorganized with respect to one another. This machine is adapted to produce such a motion as that. For example, the spiral straps can pick up the carbon black and it may be dashed against the stationary spiral straps and rebound either to a moving rod or a stationary rod, and there is no predictable motion in the Cabot machine. There is no predictable motion of material through this machine. It is disorganized. The difference between turbulent flow and streamline flow · or laminar flow is well illustrated by an experiment which is quite common in the laboratories of most universities."

After demonstrating, he continued:

"This machine is adapted to pick up particles of carbon black and dash them against other parts, and we have the im-

pacts and we have the bombarding action by that carbon * * * *.

"So in this particular machine we have a condition where it is bombarding and striking and bouncing in irregular motions. And in contrast to that the defendant's machine introduces the carbon at one end in a flocculent state and its passes through the machine in a continuous manner and issues through the other end of the machine at the same rate. Now, that is an organized flow, a predictable flow from one end to the other. We drop the material into the moving slope in the first section and it will, of course, move downward with the flow of the surface of that mass and be buried, and will be carried by the motion of the drum to the top, and it will again flow down the surface and again be carried by the rotating drum. Now, in carrying out this motion a particle is at the same time advancing from one end of the machine to the other, the motion approaching that of an ideal path. The course through which this particle would flow would be somewhat like a coil spring which is somewhat flattened at the top, the flattened portion corresponding to the slope, down which the particles run. So in this case we have a machine which carries out a predictable motion of the particles. This is carried upward, slides down and advances in a more or less auger-like motion through the machine until the flocculent material is converted into granular form."

Likewise this phrase, "turbulent, agitation by rolling and tumbling", I take, from plaintiff's claims 20 and 22, these claims being directly in issue. In defendant's description in Patent No. 2,164,164, as heretofore quoted, it uses the phrase "rolling and tumbling", and in its claim 10 uses the phrase "simultaneously tumbling the same" (material) and "continuing said tumbling". In defendant's Patent No. 2,-127,137 for the apparatus for treating finely divided powders, the phrase "tumbling and rolling" is used extensively in describing the action of its machine, but limits it to a continuous gentle agitation. Plaintiff, however, does not expressly rely here on any "turbulent agitation by rolling and tumbling". One good reason could be that there is no tumbling in its machine or process. That phrase is purely surplusage as descriptive of plaintiff's machine or process; for that matter it really does not read upon plaintiff's own disclosure taken as a whole. Just why the Patent Department allowed the claims of both Billings and Price that called for "tumbling and rolling" action, I do not know. It means something when applied to defendant's process, but means nothing when applied to plaintiff's. It is used by defendant, and not used by plaintiff, and cannot be in its machine described in its patent, or the one actually used by it commercially. Apparently it was not questioned to either of them. There is no issue made of this fact before me. Its presence however is, it strikes me, of some significance. As heretofore stated, the validity of defendant's patent in no sense is challenged. On the other hand, the effect of this falling action is urged against plaintiff's patent. My explanation and theory of this apparent inconsistency in the Patent Department ultimately allowing plaintiff's claims 20 and 22, with "agitation by rolling and tumbling", and defendant's claim 10 in Patent No. 2,164,164 with "agitation or pressure by tumbling" is plaintiff's and defendant's consent decree, dissolving the interference proceedings; that tacitly all such matters were thereby compromised and settled between the parties themselves. If so, it was binding, and it is still binding upon them, which leads me to say that this Court is no place to litigate any rights in that connection, and for that reason, is not directly raised as an issue here. In view of the bases for termination of the interference and public use proceedings, and the years of litigation that went on between these parties, before their patents were issued, it strikes me that the strongest presumption in favor of the validity of all these patents should be, and it is, indulged by this Court.

If the defendant does not now follow the teachings of the Price patent, how could it do so? That was a query that arose in my mind, which I expected to be answered, but it has not been. In my consideration of it, I am not able to see a way defendant could, considering its descriptions and claims, live up to its patent, if it is not doing so now. Whatever angle of view the Patent Department took of the Price invention, how could he use it, if this tumbling infringes, as turbulent agitation? If there is no answer, it follows that the sum and substance of this whole thing is a challenge of defendant's right to practice its patented process. It cannot turn its drums in commercial use at any of the speeds its patentee specifies without this "tumbling, tossing and roll-

ing" action, call it gentle, turbulent, violent or dynamic agitation. Without any issue presented as to the validity of defendant's patent, this Court, and no court, is the place to initially try out defendant's challenged right in that connection. Plaintiff should have refused to consent to the order dissolving the interference, and fought to a finality before the Patent Department as to whether its claims did read on the disclosure of Price, and, in view of its application being filed first, and the public use proceedings filed by the defendant having failed, whether a patent should ever issue to Price. There is where this fight should have been made.

[5, 6] Claims 19 to 27, inclusive, of plaintiff's method Patent No. 2,120,541 are in issue here. Every one of these claims embraces "turbulent agitation". If you eliminate that, you blot out plaintiff's process. In defendant's patents "gentle agitation", the material moving slowly by gravity, a shifting slowly of the material, a rolling and pressing force of the rollers in defendant's drums 1 and 2, with the tumbling and tossing, expressly limited so that the resulting action will be gentle, are called for throughout, and to eliminate these, defendant's process would be eliminated. After all, it can be readily seen, and that is another anomalous feature of this case, that these parties may in a large measure appropriate each others processes by speeding up or slowing down the revolutions per minute of their respective machines. I have no doubt but what defendant, by speeding up the revolutions of its drums, could effect a very turbulent agitation. The plaintiff, on the other hand, by reducing the revolutions of the speed of its helices, could effect a very gentle agitation or pressure. Defendant's witnesses are positive, in commercial practice, that it lives up to the speed that is called for in its patent. There is no evidence to the contrary. As to the effect of such changes in speed, upon their respective products, of course, I am not able to say, or whether it would result in practical failure for both of them, I am not able to say. It goes to show, nevertheless, that there is a remarkable kinship between these processes, and of course better known to the Patent officials at Washington.

The other specific point of infringement raised against defendant is that it uses the priming charge as called for in plaintiff's patent. It strikes me that this is even more untenable than plaintiff's other point that defendant infringes because it effects turbulent agitation. As to what is the priming charge and its function, we can not do better than refer to plaintiff's Patent No. 2,120,541, at lines 19 to 37, inclusive, in column 2 of the first page, as follows: "In whatever apparatus the carbon black is treated, the process of conversion to the dense granular form *is expedited by including in the mass a quantity of carbon black in its final form, that is to say, a mother or priming charge in said granular form.* The explanation of this probably is that an increased number of pressure and impact supplying units is thereby provided and the requisite degree of turbulence facilitated so that the agglomeration, shaping and compacting of the individual dense spherical grains takes place more rapidly than under conditions wherein the building up of the carbon black granules is brought about in an amorphous mass. *The introduction into the process of this seeding or priming step is advantageous principally because it reduces the time required for effecting a complete agglomeration or conversion of the charge but it is not otherwise essential.*" (Italics mine)

This priming charge is also expressly referred to in claim 27 of the Patent which is one of the claims in issue.

Mr. Billings deals with this same subject, as follows, on examination by Mr. Holmes, attorney for the plaintiff:

"Q. And this discovery was one of some helpfulness in the value of commercial operation, was it not? A. It is of very great practical importance.

"Q. Does it make any difference what the source of the priming charge is, how the priming charge granules are made? A. Not within reasonable limits, as long as you have got a priming charge about the right size and about the right toughness, you can make the priming charge by the process, or you can make the priming charge by an entirely different method or methods.

"Q. Have you on occasion made a priming charge by different methods? A. Oh, yes, very frequently. One very good way of making a priming charge is to compress black. The best way to do it is to compress it somewhat more heavily than is normally commercially practiced, and an excellent way of doing it is by reproducing the Wheatly Press operation or by passing the black through the bit of a rubber mill,

so the black is very firmly compressed together into hard flakes, and if you take those flakes and brush them through a screen, that tends to square them up so they have about equal dimensions, and that material will make a good priming charge, even make a good priming charge by wetting carbon black and drying it. You can use other things than carbon black for a priming charge. It is of theoretical interest rather than practical interest."

The plaintiff strenuously insists that defendant uses this priming charge practice in the third drum of its commercial machine, and that it, too, constitutes an infringement, and that turbulent agitation by reason thereof takes place in this third drum and continues in the fourth. In fact, it limits its claims of infringement on those two drums, and particularly to the third. Mr. Holmes puts it this way: "Defendant is in error in stating that plaintiff is seeking a monopoly that will prevent anyone from converting flocculent black into pellet black by mechanical movements of any and every type. On the contrary, the claims of the process patent in issue are limited to a movement of a specific kind and character. We do not claim infringement by defendant because there is a mechanical movement of flocculent carbon black in defendant's drum, but because there is in sections 3 and 4 a specific movement—namely turbulent agitation—by which the flocculent black from section 2 is converted, this turbulent agitation in sections 3 and 4 being the specific movement to which the claims in issue are limited."

When we come down to specific facts, the charge is not supported even by plaintiff's own testimony. Mr. Billings merely testifies that there is present in defendant's third drum, pellet black mixed with flocculent black. He does not testify, and no one has for plaintiff, that the pellet black in defendant's third drum is inserted as a priming charge, or for any other purpose. The admitted facts are it is not. The truth is it could not be done. There is no way for it to be done. When Mr. Billings is pressed for an answer as to where the pellet black that is in the third drum comes from, he answers that he does not know, and that he has no way of knowing.

As to this point of more turbulent agitation, or a greater zone of turbulence, in defendant's third and fourth drums, I will say frankly, I am not able to see that. In fact, I am not able to see much difference in the tumbling and tossing and rolling, or turbulence, if you wish to call it that, between defendant's first and second and third and fourth drums. It appears to me that the action is practically the same. If for no other reason, I would think the turbulence in the first two drums would be equal to the turbulence in the last two, because of the heavy rollers in them. There are no rollers in the last two drums. Otherwise, the only difference is that the interior walls of the third and fourth drums were intended to be screened, apparently for the purpose of creating more friction between the walls of the drum and the material, but in practice have been discarded. The speed and the size of all the drums are identical. The only difference is that in the last two drums the material, in its processing, is nearer to a completed stage. The weight of the material in the fourth drum as it leaves has increased from about 4 pounds at the beginning to around 25 to 30 pounds per square foot, and it is granular and more polished, by which, of course, its fluidity is greatly increased. For such reasons, there is some increase in the activity of the material, but not to any appreciably great extent.

Mr. Williams was asked the following questions:

"Q. Do you agree with Mr. Billings' testimony to the effect that there exists in the third compartment a mass of granules and that flocculent black flows from the second compartment into the third and upon that mass of granules, to agglomerate on them? A. No, it is a continual process.

"Q. Is it a practice of the Huber Company to put granules in the third compartment of its machine? A. No, it is not."

I find that to be a fact, and there is no testimony in the record that shows, or tends to show, the contrary.

Mr. Williams was asked to explain the motion that takes place in the third and fourth compartments of defendant's drum. To this he answered: "Well, it is a continuous process in which the material enters the first drum and necessarily falls on top of the down-flowing surface, and the first thing that happens to the material is that it flows down and becomes buried by the other material which flows on it. After this material is buried it ceases to flow but it is carried up with the rotation of the drum and in the process of being carried

up, it is compacted under its own weight plus an additional compacting which it gets from rollers, but the ideal path in these things is the path which winds around and proceeds toward the other end of the drum at the same time. We have exactly the same step occurring in the second drum and in the third drum. The third drum is not complicated at all by the presence of rollers, and in the third drum the material is slightly less viscous so it more nearly approaches the ideal path than in the first."

Mr. Williams was asked this question:

"Q. Referring to the third and fourth drums of the defendant's machine, wherein the alleged turbulent agitation is said to take place, will you explain to the Court what, in your opinion, takes place in those third and fourth drums? A. Well, there is no essential difference in what takes place in the third and fourth drums from what takes place in the first and second; it is a continuous operation from one to the other."

As I have heretofore indicated, the plaintiff's machine is an upright one drum machine, the inside of it pretty well filled with these upright auger like spirals, acting counter to each other. Also, that it is a one batch machine. When it is filled only with flocculent, or agitator black, and the machine set in motion, it will finally bring it to a granular or pellet shape, but it is quite a lengthy process. In order to speed up the granulation and pelletizing of the material, they pour in a batch of their completed product. These millions of pellets each forms a nucleus around which the flocculent black adheres, and builds. As was demonstrated in Court, such a priming charge very materially speeds up the process. Therefore, from an economical standpoint, it is relatively very valuable to plaintiff.

In plaintiff's process, when a batch has been worked up, the drum is unloaded and then refilled, and the priming charge added, etc. In other words, it is a process that cannot be very well conducted continuously by machinery. It takes a man or men standing by. As Mr. Williams said, defendant's is a continuous process. Defendant's four drum machine, the kind generally used commercially by it, will handle and manufacture into the finished product, from 20,000 to 25,000 pounds of black per day. It can be operated with a minimum of labor, since it is fed at one end by machinery, the flocculent black continually flowing in, and by keeping it about half full, the material gets a treatment in each of the four compartments, and finally passes from the fourth section into conveyors.

Now, this claim that defendant uses plaintiff's priming charge, is based solely on the fact that all of the material in defendant's drum does not reach a granular state simultaneously; in other words, some granulizes and reaches a pellet like form in advance of other material. Of course, when it does, it serves all of the purposes and exactly the function of plaintiff's batch priming charge. That it will so conduct itself was a well known characteristic of flocculent black, known to the public, and used, long before these gentlemen worked out these inventions. This pelletizing of carbon black does not belong to either one of these patentees, or both of them. It had been followed before their patents. All that either of them has ever claimed to have invented is an improvement over the prior methods and processes. It is shown in this very record that there is more or less granulation, and even pelletizing of the black in the agitator bins where its density is increased and its weight, from around 4 to 8 and 15 pounds. Of course, it follows there is more or less granulation in defendant's first drum, and still more in its second drum, but to no appreciable extent in those drums. But in the third drum, though not in a finished state, the material reaches a more generally pelletized state, and of course, the pelletizing of what we can still call flocculent black, flowing from section No. 2, is materially speeded up. The processing is such that there is very little of flocculent black that goes from the third drum into the fourth. Most all of it there is in a pellet form, and the function of that drum is more to finish up the product by further compacting, polishing, etc. The result is, when it leaves there, it constitutes the defendant's completed commercial product.

These results, in the order in which they happen, are essentially parts of the Price patented process. Any such advanced pelletizing that thus takes place intermediately in defendant's process, belongs to its method. This is inherent in its process, and makes it quite distinguishable from plaintiff's method of dumping a batch of its finished product into the raw flocculent black to speed up its process. That is a

feature that lends materially to the Price invention. In other words, why has plaintiff any right to object to where fast pelletization begins in defendant's process, or what takes place in defendant's third or fourth drum, as distinguished from the first and second. To sustain this claim of infringement would in effect deny defendant any patent rights, because the pellets form more or less throughout in its process and not all simultaneously.

Billings had no discovery in the fact that portions of flocculent black would agglomerate in advance of other portions, and adhere together more tenaciously, and more speedily pelletize. Nor any discovery in the fact, when it reaches such granular or pellet state, it immediately constitutes a nucleus for the further agglomeration of the black into pellets of increased size. These characteristics were public property long before Billings and Price. This charge of infringement, by reason of all those transitions taking place in defendant's process, and being appropriated by it, cannot be based on any other idea than that they belonged to Billings. They are among those old and well known things that could be appropriated then, and can still be appropriated by any one in patentable inventions of any new and useful improvement. But the more fatal answer is, that plaintiff's batch priming charge, which may be, and is sometimes, made up by processes entirely foreign to either one of these processes, is a wholly different thing from what defendant does.

My conclusions are, despite general similarity, that the Price machine, process and product are markedly different from plaintiff's. I think both Billings and Price really had something in the way of true invention, in the sense of improvements, and were inventors in a real sense, with discoveries of great commercial value, and which have had wide and profitable public recognition. As I have heretofore said, I do not find that Price, though his application was filed subsequent to Billings, learned anything from Billings. This is indicated from the very marked dissimilarity of their respective machines and processes. Even if so, there is such an improvement in the Price process over the Billings process, and it has such points of fundamental difference, as to clearly make the Price process patentable. The superiority of the Price machine is in its simplicity and economy. As the phrase goes: "It is as simple as a pocket knife", while the Billings' machine in its construction and action is relatively complicated and more expensive to operate.

I can not say there is any superiority of either product over the other. To the eye they appear to be the same. Through a 27 power microscope they are quite distinguishable. Plaintiff's is more uniformly spherical, also in size—in polish, more beautiful to look at; when broken open, more uniform in structure, being made up rather consistently, from an infinitesimal core or nucleus, at the center and formed into concentric rings or surfaces, similar to the heart of a tree with its rings, indicating each year of growth; while defendant's is not so polished or uniform in size, shape or structure; being polyhedral, many-sided, in shape, without such a systematic build-up from a core. To say they are generally similar, would be correct. Each process results in a so-called pellet. If they were to be used in some way comparable to shooting them out of a gun, plaintiff's would be vastly superior to defendant's, because plaintiff's would be more like shooting shot, while defendant's more comparable to shooting slugs. They are both stout enough to withstand the ordinary handling preparatory to shipping; and in shipping, and in unloading for use in the rubber mills. Any technical differences in the viscosity or fluidity of the two products apparently makes no appreciable difference as to their commercial use or values. I would say for the purposes manufactured, one is as good as the other, and equally meets the needs of the trade.

The other defenses presented will not be discussed or further touched upon, other than as has been indicated heretofore, that I am not impressed with defendant's claim that plaintiff's patents are invalid.

For the reasons stated, the complaint will be dismissed on the ground that the defendant has not infringed the plaintiff's patents and also on grounds stated in defendant's motion for summary judgment.